## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED SOVEREIGN AMERICANS, INC.<br>167 Lamp and Lantern Village<br>Suite 194<br>Chesterfield, MO 63017 | CIVIL ACTION |
| *And* | |
| BERNARD JOHNSON<br>2701 Nonesuch Rd. #2107<br>Abilene, TX 79606 | Case No.: _____ |
| *And* | |
| CITIZENS DEFENDING FREEDOM<br>5900 Balcones Drive, Suite 100,<br>Austin, TX 78713.<br>                    *Petitioners,* | |
| v. | |
| JANE NELSON, IN HER OFFICIAL<br>CAPACITY AS THE SECRETARY OF<br>STATE OF TEXAS<br>James E. Rudder Building<br>1019 Brazos Street<br>Austin, TX 78701 | |
| *And* | |
| KEN PAXTON, IN HIS OFFICIAL<br>CAPACITY AS THE ATTORNEY<br>GENERAL OF TEXAS<br>William P. Clements Office Building<br>300 W 15th St,<br>Austin, TX 78701 | |
| *And* | |

MERRICK GARLAND, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
THE UNITED STATES
950 Texas Avenue NW
Washington DC 20530

                    *Respondents.*

## PETITION FOR RELIEF IN THE FORM OF A WRIT OF *MANDAMUS* [1]

*TO: The Honorable, the Judges of Said Court:*

United Sovereign Americans, Inc., a Missouri nonprofit corporation, Bernard Johnson, an individual residing in the State of Texas, and Citizens Defending Freedom, a non-profit organization with a registered place of business in Texas, Petitioners, by counsel, van der Veen, Hartshorn, Levin, & Lindheim, through Bruce L. Castor, Jr., Esquire, hereby submit this Petition for Relief in the Form of a Writ of *Mandamus*, directed to Respondents, Jane Nelson, in her Official Capacity as the Secretary of the State of Texas, Ken Paxton, in his individual capacity as Attorney General of Texas, Merrick Garland, in his official capacity as Attorney General of the United States, and

                    *Respectfully Represents*:

## I.    SUMMARY OF PETITIONERS' ARGUMENT AND EXAMPLES OF RELIEF REQUESTED

---

[1] Petitioners are cognizant of Federal Rule of Civil Procedure 81(b) which abolished mandamus actions in United States District Court, but nonetheless authorizes "relief previously available through [writs of mandamus] by appropriate action or motion under these rules." F.R.C.P. 81(b). Petitioners herein are seeking relief via the All Writs Act (§ 1361) and an Action to Compel a United States Officer to Perform His/Her Duty (§ 1361).

1.      The Congress of the United States has outlined the minimum standards which must be maintained by every state in order for a federal election to be considered reliable.  As outlined below, in Texas's 2022 federal election those minimum standards were not met by State election officials rendering the certified election results that year unreliable.  Respondents in their official capacities have engaged in insufficient efforts to ensure that the 2022 performance is not repeated in subsequent federal elections beginning in 2024.

2.      If the 2022 election performance is repeated in 2024, Petitioners and all Texas voters will suffer damages.

3.      Apart from Court action in equity, no other mechanism exists in the law for Petitioners to require Respondents to perform their ministerial duties to ensure that Texas' federal elections be conducted in conformity with the law as Congress has set forth.

4.      Only this Honorable Court has the power to require Respondents to act to bring the 2024 (and subsequent) federal elections supervised by Texas authorities into conformity with the minimum standards for reliability set down by Congress and outlined *infra*.

5.      Without the Court's action, Petitioners believe and therefore aver that the 2024 (and subsequent) Texas federal election results will be unreliable in the same way, and thus unreliable for the same reasons that the 2022 results are unreliable.

6.      Petitioners seek this Court's intervention to ensure that only properly registered voters cast votes in combined federal and state elections beginning in 2024.

7.      Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and Texas elections beginning in 2024.

8.      Petitioners seek this Court's intervention to ensure that all votes properly cast are counted *correctly* in combined federal and Texas elections in even numbered years beginning in 2024.

9.      Petitioners seek this Court's intervention to ensure that all voting systems are compliant with all critical infrastructure requirements and risk assessments are completed within the actual use context, thereby assuring that every ballot is correctly and uniformly processed, as well as accurately tabulated and secured in combined federal and Texas elections beginning in 2024.

10.     Petitioners seek this Court's intervention to ensure that the authenticity of every ballot counted is proven by the maintenance of a comprehensive, unbroken chain of custody from the voter's hand to the final certified result, and that State election officials maintain records of said chain of custody post-election, in compliance with all legally prescribed safeguards in combined federal and Texas elections beginning in 2024.

11.     Petitioners seek this Court's intervention to ensure that combined federal and Texas elections in even numbered years beginning in 2024 are conducted with the transparency required by law.

12.     Petitioners seek this Court's intervention clarifying and ordering that the currently accepted Federal definition "to certify" is *to attest that an official measurement is both accurate and the finding of accuracy was reaching in a fully compliant manner*, thereby, directing that the "certification of elections" by State election officials of combined federal and Texas elections from 2024 onward constitutes an "attestation," ostensibly under penalty of perjury, by the certifying official(s), that the vote counts are accurate, and the cast and counted votes, and the election itself, were all conducted in compliance with applicable federal and state law.

13.     Petitioners, upon review of the statutes cited below, believe and therefore aver that federal and state law specifies what State officials must conform to, *at a minimum*, to properly conduct a combined federal and state election and prior certifying that election.

14.     Petitioners believe and therefore aver that based on the analysis below, combined with the various exhibits attached to this petition and incorporated by reference herein, that in the 2022 combined federal and state election, officials of the State of Texas failed to ensure that safeguards were in place as mandated by various statutes designed to ensure the integrity of the elections.

15.     Petitioners believe and therefore aver the failure by State election officials to know of and implement the safeguards required by law in 2022 allowed State election officials to certify that election despite analysis showing the election results were *per se* unreliable on account of apparent error rates exceeding those the law permits before the results in *any* federal election becomes unreliable.

16.     Petitioners believe and therefore aver that apparent error rates that exceed the maximum error rate allowed by law destroyed the integrity of the 2022 election making full confidence in the accuracy of that election impossible.

17.     While Petitioners cannot state with certainty that the 2022 Texas General Election produced "winning" candidates who should not have won, Petitioners believe and therefore aver that Texas officials cannot state with certainty that all "winning" candidates received more votes than the "losing" candidates because the election itself was compromised by the State's failure to conform to the requirements of federal law designed to ensure reliable election results.

18.     Petitioners believe and therefore aver that Congress mandated the maximum number of election errors which were permissible in the 2022 combined federal and state

elections in the State (and, indeed, in all states and voting territories).  An error rate above the maximum permissible rate set by Congress renders an election *uncertifiable* because such results are *per se* unreliable.  Nevertheless, State officials certified the 2022 election.

19.     Petitioners do not seek relief in this Court in a challenge to the outcome of the 2022 federal election in Texas.  Petitioners agrees that it is possible that in every federal contested election supervised and certified by the State in 2022, the "winner" received more votes than the "loser."

20.     Petitioners believe and therefore aver, however, that the certification by Texas officials of the 2022 election was done despite the integrity of the election being suspect on account of *apparent* error rates occurring in that election that exceeded the error rate Congress permits before federal election results cannot be relied upon as accurate, and the State did nothing to investigate those apparent errors before certifying the election.

21.     **Petitioners believe and therefore aver that it is reasonable to believe that systemic issues which occurred in the 2022 combined federal and state election in Texas will continue uncorrected in 2024, 2026, 2028, and so forth, absent intervention by this Court.**

22.     Petitioners have called the various issues with the 2022 election to the attention of State officials who failed to take sufficient action to ensure no future repeats of those issues cited here affecting the integrity of the 2022 election.

23.     The relief requested by Petitioners in the form of a Writ of *Mandamus* seeks, broadly speaking, this Court order Respondents to perform the *ministerial* functions their jobs require by taking actions to rectify reliability issues evident in the 2022 election.[2]

---

[2]     Petitioners do not request this Court order Respondents to exercise their *discretion* or make *any* decision at all apart from enforcing the specific, non-discretionary, requirements of the law outlined, *inter alia,* below.

## II.    2022 COMBINED FEDERAL AND STATE ELECTION IN TEXAS PRODUCED UNRELIABLE RESULTS AND SHOULD NOT HAVE BEEN CERTIFIED

24.    In the Help America Vote Act ("HAVA") 52 US.C.A. § 21081, **Congress has mandated as follows: HAVA - voting system error rate "…(5) Error RATES.—The error rate of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission ("FEC") which are in effect on the date of the enactment of this Act."**

25.    Congress enacted and President Bush signed HAVA into law in 2002, and it remains the law of the United States to date.

26.    The voting standards of the FEC in effect at the time Congress enacted HAVA in 2002 were the Voting Systems Standards Volume I: Performance Standards (2002).[3]

27.    **Those voting standards, in effect at the time HAVA became law, allowed for one error per 500,000 ballot *positions*.**

28.    Petitioners believe and therefore aver that a federal election that exceeded an error rate of one error per 500,000 ballot *positions* renders a federal election unreliable under HAVA.

29.    As the HAVA provision enacted in 2002 cited above has not changed, the error rate of one error per 500,000 ballot *positions* is currently the law of the United States.

---

[3]     As of 2021, there have been five iterations of national level voting system standards. The Federal Election Commission published the first two sets of federal standards in 1990 and 2002 (VSS1990 and VSS2002). The Election Assistance Commission then adopted Version 1.0 of the Voluntary Voting System Guidelines (VVSG 1.0, or VVSG2005) on December 13, 2005. On March 31, 2015, the EAC commissioners approved VVSG 1.1 (VVSG2015). On February 10, 2021, the EAC approved VVSG 2.0 (VVSG2021).

30.     A "ballot *position*" refers to the number of individual "choices" a voter could make on a single ballot.  For example, if a particular ballot has thirty little circles for the voter to fill-in or not fill-in, that single ballot would be said to contain thirty ballot *positions*.

31.     A voting *system* error occurs anytime the voting scanning machine should have discerned an error, not made by the voter, while counting one of those ballot positions on a scanned ballot.

32.     Experts working for the FEC estimated that 500,000 ballot *positions* equaled 125,000 *individual ballots*. (See Federal Election Assistance Commission Voluntary Voting System Guidelines of 2015, *U.S. Federal Election Assistance Commission*. United States [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf)

33.     Petitioners believe and therefore aver that the FEC desired to clarify the meaning of 500,000 ballot *positions* in terms of how many individual *ballots* "make-up" 500,000 ballot *positions* in order to make easier understanding the election "error rates" permissible by HAVA, giving state election officials an easier metric with which to work in discerning how many errors at a maximum are permitted in any given election before that election becomes unreliable and, thus, uncertifiable.

34.     Petitioners believe and therefore aver (and will present expert testimony to so substantiate) that the calculation made by the FEC that 500,000 ballot positions represent 125,000 individual ballots is correct and constitutes a proper interpretation of federal law and Congressional intent under HAVA.

35.     In the 2022 Texas General Election, official state certified results claim that 8,102,908 individual ballots were cast.

36.     For the 2022 General Election, then, if 8,102,908 (ballots cast) is divided by 125,000 (because the law allows for one error per 125,000 ballots), that leaves sixty-five (65), rounded up, as the maximum number of errors permitted under federal law for the 2022 election. Only upon a showing of 65 or fewer errors, then, would HAVA permit State election officials to certify the 2022 election as valid.

37.     If there were more than sixty-five voting system errors in the entire ballot tabulation for all ballots cast in the 2022 election in Texas, the election results are unreliable.

38.     Texas exceeded this benchmark of sixty-five voting system errors in the 2022 General Election as outlined below.

39.     Petitioners believe and therefore aver that contributing to the unreliability of the State's 2022 election is the fact that Texas's voter registration rolls, themselves, contained *hundreds of thousands* of *potential* errors at the time of the 2022 General Election.

40.     These potential errors were in the form of illegal duplicate registrations, invalid addresses, age discrepancies, names embedded with numerals and symbols, voters listed in the county voter rolls but not the state voter rolls, registration edits without an effective date of registration change, voters that were cancelled and then reactivated, and transposed names with the same address. (*See* Exhibit "A" for Petitioner United Sovereign Americans Texas 2022 General Election Validity Scorecard.)

41.     While Congress may not have specifically intended for these types of errors to be included in the one out of 500,000 error rate, Petitioners believe and therefore aver that this figure provides a general benchmark for what Congress considered an acceptable degree of error in federal elections.

42.     Such errors jeopardize the validity of elections throughout the State, bring doubt as to the accuracy and integrity of the State's currently-in-place voting systems, undermine Texans' collective voting rights, all in violation of existing state and federal election laws.

43.     Petitioners seeks redress from these voter registration apparent errors, relief from blatantly inaccurate voter registration rolls, relief from discrepancies between votes cast and actual votes reported, and relief from extreme voting errors generally, which collectively and historically amount to violations of federal election laws, Texas election laws, and various voting rights encompassed by the United States Constitution.

44.     The aforesaid violations of federal and state law have in the past resulted in the certification of election results from provably flawed, inaccurate, and obscure processes outside the view of impartial witnesses or the public, and Respondents have refused collectively to maintain or enforce compliance with federal and state required transparency mandates.

45.     Petitioners have brought this issue to the attention of Respondents, who have done absolutely nothing to address these errors, ensuring future elections will suffer from the same deficiencies. *See* United Sovereign American's Letter to Texas Election Division as Exhibit "B."

46.     Furthermore, rather than be alarmed by these apparent errors pursuant to prevailing election laws, Respondents instead have collectively ignored the issue of the unreliable election results their lack of effort have produced.

47.     Petitioners believe and therefore aver Respondents have failed to adequately police and monitor problems with the voter rolls and failed to adequately fix voting registration errors within the State, despite being in the best position to ensure the reliability, integrity, and accuracy of Texas's elections to ensure veracity of the State's election results.

48.     Petitioners have repeatedly made good faith and sincere efforts to negotiate and convince Respondents to respond to its concerns.

49.     Petitioners have repeatedly shown Respondents evidence of potential violations of election law, regarding the conduct of elections by local and state officials charged with administering elections on behalf of all citizens in accordance with the law.

50.     The risk of election subversion is indisputable, but the State has denied Petitioners a fair hearing, despite the serious nature of Petitioners' findings calling into question the very reliability, integrity and accuracy of prior federal elections administered by the State.

51.     The prayer for relief seeks the protection of Petitioners' rights, as well as those of every voting citizen of the State, to have their vote fairly counted in an open and reliable election as such elections are defined according to law and outlined below.

52.     Respondents have denied Organizational Petitioners' members their right to a fair vote.

53.     Respondents' failure has directly put at risk the validity of the election for the seat for which Petitioner Johnson is contesting *this* year.  That congressional seat encompasses a district over which this Honorable Court has jurisdiction since a portion of the congressional district encompasses the City of Amarillo.

54.     Furthermore, Respondents appear to have followed procedures that have obscured the ability to audit the 2022 general election to render the outcomes factually unknowable at the time of certification.

55.     Petitioners believe and therefore aver Respondents have violated multiple federal and state laws, or negligently allowed such violations to occur, while loudly proclaiming the infallibility of the State's election results.

56.     Respondents insist that Petitioners have adequate voting rights, while simultaneously fighting from every conceivable angle to prevent Petitioners from attempting to protect those rights. Respondents' collective actions in refusing to address the problem extinguish and undermine the very meaning of the right to vote in a fair representative democracy.

57.     Respondents can and should be compelled to address compliance with existing election law. Specifically: compelled to adequately investigate the issue, prosecute anyone in violation of federal and/or state law, and actively work to bring the State back into compliance with federal and state election law mandates so that Texas' constitutionally enshrined voting rights are upheld and preserved.

58.     The All-Writs Act, 28 U.S.C. § 1651 provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law."

59.     District Courts of the United States have original jurisdiction over any action in the nature of *mandamus* to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff. 28 U.S.C. § 1361.

### III.     PARTIES

60.     United Sovereign Americans, Inc., is a nonprofit corporation incorporated in the state of Missouri.

61.     Bernard Johnson is an adult individual who, at all times relevant hereto, resided at 2701 Nonesuch Rd. #2107 Abilene, TX 79606, and is presently running for Congress.

62.     Citizens Defending Freedom is a non-profit organization with an office in Texas and a registered address of 5900 Balcones Drive, Suite 100, Austin, TX 78713.

63.     Jane Nelson, in her official capacity as the Secretary of the State, was appointed by the Governor to oversee the Department of State. She and her department are tasked with administering and ensuring the State's compliance with Texas' Election Code, the State's compliance with federal law including the Help America Vote Act, and the National Voter Registration Act. During a federal election, she acts as a quasi-federal official pursuant to Article I, sec. 4 of the United States Constitution (as later amended) delegating power to the individual states to manage election of federal officials subject to the oversight of Congress.  The Texas Department of State is a government entity responsible for administering and ensuring the State's compliance with Texas's Election Code and the State's compliance with federal law including the Help America Vote Act, and the National Voter Registration Act. During a federal election, its officers also function as a quasi-federal officials pursuant to Article I, sec. 4 of the United States Constitution (as later amended) delegating power to the individual states to manage election of federal officials subject to the oversight of Congress.

64.     Ken Paxton, in his Official Capacity as the Attorney General of Texas, is responsible for overseeing and managing the Office of the Attorney General of Texas which is a government agency tasked with the enforcement and prosecution of state law in addition to ensuring that state actors, including those acting within the Texas Department of State, are complying with Texas law.

65.     Merrick Garland, in his Official Capacity as the Attorney General of the United States, is the chief law enforcement official of the United States and is responsible for overseeing and managing the Department of Justice of the United States which is a government agency tasked with the enforcement and prosecution of federal law in addition to ensuring that state and

federal actors, including those acting in the various states within the United States, are complying with Federal law.

## IV.    JURISDICTION AND VENUE

66.    This Court has jurisdiction pursuant to 28 U.S.C. § 1651.

67.    This Court has jurisdiction pursuant to 28 U.S.C. § 1361.

68.    This Court additionally has subject matter jurisdiction over this complaint because the case presents substantial questions of federal law, and the state claims are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. §§ 1331 and 1367.

69.    This Court has personal jurisdiction as the Respondents are a collection of State of Texas agencies and actors, the State of Texas is within the jurisdiction of the United States, and Petitioner Johnson is running for a congressional seat in Texas' 19th Congressional District, a portion of which is within the Northern District of Texas.

70.    "When a state exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Gray v. Sanders*, 372 U.S. 368 (1963) (citing *Gomillion v. Lightfoot*, 364 U.S. 347 (1960).

71.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1).

## V.    STANDING

72.    Petitioner Johnson asserts standing because he is *directly affected* by the State's failure to correct the errors prevalent in the Texas 2022 General Election because he is running for federal office in the succeeding federal election in 2024 and believes and therefore avers his personal interests are harmed by Respondents' failure to act.

73.     Citizens Defending Freedom asserts organizational standing as it represents a group of Texas registered voters each expecting their vote to be properly counted and weighted and fear that will not occur in 2024 given the errors occurring in 2022 noticed to Respondents who have insufficiently addressed the causes for such errors.

74.     Petitioners extracted data from Texas's statewide voter registration database and uncovered numerous registration and voting violations. In particular, Petitioners discovered that for the 2022 election there existed **196,658** apparent voting violations, including:

    a.   37,167 votes were cast by voters with illegal duplicate registrations;

    b.   29,847 votes were cast by voters from invalid addresses;

    c.   620 votes were cast with age discrepancies;

    d.   178 votes were cast with names embedded with numerals and symbols;

    e.   122 votes were cast which had transposed names on the same address;

    f.   142 votes from unique voter registrations that cast multiple votes according to the state voter rolls;

    g.   1715 votes from unique voter registrations, which cast multiple votes according to the county voter rolls;

    h.   7 votes from a voter listed in a county voter roll with a state voter ID of zero;

    i.   13,229 voters listed in the state voter roll with an unidentified voting method;

    j.   113,386 voters recorded in a county voter roll, but missing from the state voter roll, or vice-versa; and

    k.   244 votes where the voting method differs in the county voter rolls and the state voter rolls.

(*See* Exhibit "A" for Texas 2022 General Election Validity Scorecard).

75.    Petitioners, after extracting data from Texas's statewide voter registration database, also discovered that the voter rolls were inaccurate. In particular, the Texas voter rolls for the 2022 election contained **1,352,202 errors** including:

   a.   166,983 illegal duplicates;

   b.   105,922 invalid addresses;

   c.   7,714 age discrepant registrations;

   d.   414 names embedded with numerals and symbols;

   e.   10,350 voters listed in the county voter roll but not the state voter roll;

   f.   755,982 voter rolls were edited without an effective date of registration change;

   g.   277,598 voters were edited with an effective date of registration change;

   h.   28,815 cancelled voters, then reactivated; and

   i.   344 voters had transposed names with the same address.

*See* Exhibit "A" for Texas 2022 General Election Validity Scorecard.

76.    Furthermore, the official state certified result from the state election results webpage claims that 8,102,908 votes were cast, but the official *state* voter roll count says that 8,120,067 voters voted – a difference of **17,159** votes for which there is no explanation. *See* Exhibit "A."

77.    Furthermore, the official state certified result from the state election results webpage claims that 8,102,908 votes were cast, but the official *county* voter rolls says that only 8,084,602 voters voted – a difference of **18,306** votes for which there is no explanation. *See* Exhibit "A."

78.     Petitioners have been and are currently harmed by the State of Texas voting systems presently and formerly in use in the State of Texas state and federal elections. Respondents have allowed, and continue to allow, violations of federal election laws, Texas election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights.

79.     Petitioner Bernard Johnson, is a resident of Abilene, Texas, and is running for Congress in Texas's 19th congressional district. *See* Bernard Johnson's Campaign Website at https://www.bernardjohnson4congress.com/.

80.     As a candidate for federal public office in an election overseen by Texas' state election officials upon delegation from the Texas legislature, Petitioner Bernard Johnson is especially and irreparably harmed by the collective failures of Respondents to keep the voter registration rolls of Texas accurate and in compliance with various federal and state laws regarding voting integrity.

81.     The registration and voter roll inaccuracies means that Petitioner Bernard Johnson cannot properly devise and budget for campaign strategies, mailing campaigns, and other activities intrinsic in an election season/campaign.

82.     For example, due to inaccurate voter rolls and registrations in the State of Texas, Petitioner Bernard Johnson has been caused to spend money campaigning to garner votes based on registrations and voter rolls that may be inaccurate using that inaccurate information to his detriment in making decisions on how to allocate his campaign resources.

83.     Petitioner Citizens Defending Freedom-USA ("CDF") is a nonpartisan, grassroots organization committed to improving election integrity, among other purposes, with a registered place of business in the State of Texas.

84.     CDF in Texas is comprised of Texas citizens who have an interest in the elections being administered fairly, properly, and accurately.

85.     From November 2020 to November 2023, CDF Collin County, TX conducted a two-year investigation into the Collin County Register of Ballots and Tabulation Results for election day, in addition to assessing Texas voting procedures, chain of custody, mail ballots, compliance, and accuracy statewide. In so doing, CDF Collin County, TX uncovered that for each election in that period 78,341 ballots are unaccounted for (20.06%) and only 42.37% of the polling locations reconciled during that timeframe. *See* Exhibit "C."

86.     In addition, CDF determined that forms required by various polling locations were not properly completed, gathered, or retained, and the status of unused ballots remains unknown. *See* Exhibit "C."

87.     By way of an evidentiary averment, though not a named petitioner herein, Petitioners believe and therefore aver Barry Wernick ("Wernick"), an individual and resident of Texas, was a candidate in the Republican Primary election on March 5, 2024.

88.     Wernick requested a recount of the aforesaid election, which began on April 2, 2024.

89.     Wernick witnessed improper breaches of voter privacy throughout the recount and election process, and brought these issues to the attention of authorities, who refrained from action. See Exhibit "D," an affidavit from Petitioner Barry Wernick.

90.     In addition, as a candidate for office, Wernick was directly affected by invalid and/or incomplete registrations – information which could very easily effect campaign strategy and allocation of funds.

91.     Though not a named petitioner herein, Dan Rogers ("Rogers"), is an individual and a resident of Texas, who has served as a Potter County GOP Chair since 2018.

92.     Rogers attempted to get the county to agree to a primary election in Potter County without the use of electronic voting machines, due to the data concerns and issues related to reliability of the voting machines.

93.     Rogers wished instead to use hand-marked, self-authenticated, physical ballots and a machine tabulation system for efficiency, with spot checked hand counts for accuracy. Rogers believed that this method was the most accurate and cost-effective way to comply with HAVA, NVRA, and various Texas laws regarding voting accuracy and registration rolls.

94.     In particular, Rogers complained that under the current computerized system, no physical ballot exists, and therefore there is no way to establish the accuracy of a voting system by hand counts.

95.     Regardless of these concerns, Rogers' request was ignored, and county election officials refused to require the election use physical ballots. *See* Exhibit "D."

96.     The violations of State of Texas election laws, federal election laws, the U.S. Constitution, and federal civil rights laws pertaining to voter registration rolls, transparency, compliance, and certification of the voting systems, and the serious issues hereinafter discussed with the overall voting systems exemplify Petitioners' injury.

97.     The injury to Petitioners and all Texas voters would cease to exist, or be relieved, if the Court grants Petitioners' requested relief.

98.     The Supreme Court has indicated that if one party to a lawsuit has standing, other entities can join as parties without having to independently satisfy the demands of Article III,

provided those parties do not seek a distinct form of relief from the party with standing. *E.g.,*

*Horne v. Flores*, 557 U.S. 433 (2009).

## VI.   BACKGROUND

### A.  THE CONSTITUTIONALLY PROTECTED RIGHT TO VOTE

99.   The United States Constitution grants the people the right to choose their

representatives from among the people of the several states, according to the voting eligibility

requirements of the state. U.S. Const. art. 1, § 2.

100.   The 14th Amendment of the United States Constitution, Section 1, defines a

"citizen" as all people born or naturalized in the United States and subject to the jurisdiction

thereof.

101.   The 14th Amendment of the United States Constitution, Section 2, protects eligible

citizen voters against denial or abridgment of their vote.

102.   "The very essence of civil liberty certainly consists in the right of every individual

to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 1

Cranch 137, 5 U. S. 163 (1803).

103.   Federal courts regard the right to vote in a fairly conducted election as a

constitutionally protected feature of United States citizenship. *Reynolds v. Sims*, 377 U.S. 533,

554-55 (1964).

104.   After the 2020 Presidential Election, pervasive discussion reported on by the

media focused on the validity of the presidential election results within the State of Texas and

elsewhere.

105.     Discussions and/or litigation in Texas, as well as in other states around the Nation, centered on whether raw vote totals were accurate, with particular attention focused on the question: if all ballots in dispute were decided in the favor of one candidate for president over the other, would that have *changed the outcome* of the election in that state?

106.     That questions concerned whether the recorded vote totals, viewed in the light most favorable to the losing candidate in any given state, *could* have affected the awarding of electoral votes from said state, which, in turn, *might* have affected the determination of the "winner" of the elections for president and vice-president in the Electoral College.

107.     The media widely reported that no court ruled that, even if all disputed ballots were assumed to have been found to be favorable to the Republican Candidate during the 2020 presidential election, the outcome in any disputed state would have been affected. Furthermore, courts determined, according to such reports, *insufficient evidence existed* such that a court could find that the outcome of the election in any disputed state unreliable.

108.     Petitioners do not seek to revisit the results of the 2020 presidential election, nor to re-examine the conclusions drawn by the various courts and media outlets as summarized above.

109.     Petitioners posit a different question than above: ***How many disputed ballots found to be improperly cast in any given federal election may occur before the reliability and integrity of the entire election becomes suspect?*** Petitioners respectfully represent that Congress has answered this very question as outlined further below, and Congress' answer to this question forms much of the basis of the instant Petition.

110.     In *In re: Coy*, 127 U.S. 731 (1888), the United States Supreme Court held that Congress had authority under the Constitution's Necessary and Proper Clause to regulate any

activity during a mixed federal/state election that exposed the federal election to potential harm, whether that harm materialized or not. *Coy* is still good law throughout the country. *See*, *United States v. Slone*, 411 F.3d 643, 647 (6th Cir. 2005); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 874–75 (5th Cir. 1982).

111.   In *Oregon v. Mitchell*, the Supreme Court stated:

> The right to vote is, of course, different in one respect from the other rights in the economic, social, or political field which, as indicated in the Appendix to this opinion, are under the Equal Protection Clause. The right to vote is a civil right deeply embedded in the Constitution. Article I, § 2, provides that the House is composed of members 'chosen . . . by the People' and the electors 'shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.' The Seventeenth Amendment states that Senators shall be 'elected by the people.' The Fifteenth Amendment speaks of the 'right of citizens of the United States to vote' -- not only in federal but in state elections.
>
> * * *
>
> [T]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. This 'right to choose, secured by the Constitution,' *United States v. Classic*, 313 U.S. 299, is a civil right of the highest order. Voting concerns 'political' matters; but the right is not 'political' in the constitutional

sense. Interference with it has given rise to a long and consistent line of decisions by the Court; and the claim has always been upheld as justiciable . . . as the right in the people of each State to a republican government and to choose their Representatives in Congress is of the guarantees of the Constitution, by this amendment a remedy might be given directly for a case supposed by *Madison*, where treason might change a State government from a republican to a despotic government, and thereby deny suffrage to the people.

*Mitchell*, 400 U.S. 112 at 138-39 (1970).

112.    Justice Harlin also stated the following in his concurring opinion:

[A]s the right of the people of each State to a republican form of government and to choose their Representatives in Congress is of the guarantees of the Constitution, by this amendment a remedy might be given directly for a case supposed by Madison, where treason might change a State government from republican to a despotic government, and thereby deny suffrage to the people.

*Mitchell*, 400 U.S. 112 at 185 (Harlan, J., concurring in part).

113.    The Supreme Court further stated: "we are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us." *Reynolds v Sims*, 377 U.S. 533, 566 (1964).

114.    "Every voter in a federal . . . election . . . whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, *without its being distorted by fraudulently cast votes*." *Anderson v. United States,* 417 U.S. 211, 227 (1974) (emphasis added).

### B.  NATIONAL VOTER REGISTRATION ACT ("NVRA")

115.    Congress passed The National Voter Registration Act ("NVRA") for the purpose of ensuring accurate and current voter registration rolls to enhance the integrity of elections.

116.    In so doing, Congress found that: (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities. 52 US.C.A. § 20501.

117.    NVRA exists in part to "protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." 52 US.C.A. § 20501.

118.    NVRA *requires* states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change of address. 52 U.S.C. § 20507(a)(4).

119.    Similarly, the U.S. Election Assistance Commission ("EAC") is required by law to report to Congress its findings related to state voter registration practices. 52 U.S.C. § 20508(a)(3).

120.     Federal regulations require states to provide data to the EAC for use in their reports, including the numbers of active voters, and the numbers of registered voters removed from the rolls for any reason. 11 C.F.R. § 9428.7(b)(1), (2), (5).

121.     The NVRA requires the States to complete any program the purpose of which is to remove ineligible voters from the official lists of eligible voters not later than ninety (90) days prior to an election.

122.     NVRA has two (2) methods of enforcement. First, the Attorney General can petition the court for declaratory and injunctive relief. Second, a private citizen can pursue a cause of action with certain requirements as follows: in a private action, notice is required, in that a person must notify the chief election official of the State involved. If the violation is not corrected within 90 days of receipt of the notice or within 20 days after receipt of the notice, if the violation occurred within 120 days before the date of an election for office, the aggrieved person may bring a civil action in an appropriate district court seeking relief. In the alternative, if the violation occurs 30 days before the date of an election for federal office, no notice is required.  Petitioners here have provided notice to the State of Texas as required by NVRA.

123.     Although the NVRA authorizes a private cause of action, as sought here, in the form of declaratory or injunctive relief, this "remedy" is toothless. Any Court in the United States would have great reluctance to formally order election officials to correct the NVRA error and/or decertify an election so close in time to an actual election or just after certification.

124.     Additionally, to what extent the NVRA requires a hypothetical plaintiff to have suffered injury is not clear – standing could be a troublesome burden to prove particularly if the

harm, such as voter fraud and dilution, has been committed on a class people, *e.g.*, the electors as a whole, rather than on an individual person.[4]

125.    Furthermore, a respondent could attempt to persuade a court to invoke the doctrine of laches to avoid the unpleasant task of questioning election officials, inquiring into potentially fraudulent elections, and inaccurate voting rolls, despite a hypothetical single plaintiff or group plaintiff being in full compliance with the private NVRA notice requirements.

126.    Congress's power to pass the NVRA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voter rolls a requirement to uphold the general (as opposed to the individual) right of the people to choose their representatives.

127.    Petitioners bring here a private cause of action under NVRA.

### C.  HELP AMERICA VOTE ACT ("HAVA")

128.    The Help America Vote Act ("HAVA") exists in part to "establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and other purposes." H.R. 3295 (2002).

129.    HAVA requires that *voter roll databases* contain only the registrations of qualified citizen voters residing in that state. 52 US.C.A. § 21083(a).

130.    HAVA defines a *voting system* as "the total combination of mechanical, electromechanical, or electronic equipment (including software, firmware, and documentation required to program, control, and support the equipment) that is used to define ballots; to cast

---

[4]      Petitioners suggest it is unlikely Congress intended to require individual standing in cases where mass violations of the NVRA occur due to widespread errors.  Petitioners aver it is much more likely Congress intended organized groups of voters to bring private actions under such circumstances under an "organizational standing" theory.

and count votes; to report or display election results; and to maintain and produce any audit trail information." 52 US.C.A. § 21081(b).

131.    The purpose of any voting system is to accurately record, store, consolidate, and report the specific selections, and absence of selections, made by the voter as well as to accurately measure the intent of the total body of eligible voters that voted.

132.    Petitioners believe and therefore aver the ability to "cast and count votes" begins with establishing eligibility and registering only qualified citizens into voter registration databases, thus assuring that all ballots granted, cast, and counted, are lawful.

133.    Petitioners believe and therefore aver that inaccurate voter rolls have significant negative consequences in elections.

134.    Per HAVA, in any given state, each qualified voter is granted a unique statewide identifier in a database, which averts the risk of double-voting or extra ballots being cast in the name of one individual voter.

135.    HAVA furthermore requires that federal elections adhere to an accuracy standard established by the FEC through Section 3.2.1 of its Voting System Standards (2002),which states n relevant part that error rates are "…*set at a sufficiently stringent level such that the likelihood of voting system errors affecting the outcome of an election is exceptionally remote even in the closest of elections*." United States (2002) *U.S. Federal Election Commission FEC*. United States [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf (emphasis added).

136.    Accuracy in a voting system is defined as the ability of the system to capture the intent of voters without error. United States. (2002) *U.S. Federal Election Commission FEC*.

United States [Web Archive] Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf

137.     Section 301 of HAVA regarding "Voting System Standards," states that the "error

rate of [a] voting system in counting ballots (determined by taking into account only those errors

which are attributable to the voting system and not attributable to an act of the voter) shall

comply with the error rate standards established under section 3.2.1 of the voting systems

standards issued by the Federal Election Commission." 52 US.C.A. § 21081(a)(5).

138.     Petitioners ask the Court to recall that, the FEC voting systems standards of

section 3.2.1 establish that "the system shall achieve a target error rate of no more than **one in**

**10,000,000 ballot positions, with a maximum acceptable error rate in the test process of one**

**in 500,000 ballot positions.**" See *supra*. (emphasis added)

139.     The Voluntary Voting System Guidelines ("VVSG"), Version 1.1, Section 4.1.1 –

Accuracy Requirements state, in part, **"[a]ll systems shall achieve a report total error rate of**

**no more than one in 125,000."** Furthermore, "[t]he benchmark of one in 125,000 is derived

from the 'maximum acceptable error rate' used as the lower test benchmark in the 2005

Voluntary Voting System Guidelines Version 1.0. That benchmark was defined as a ballot

position error rate of one in 500,000. The benchmark of one in 125,000 is expressed in terms of

ballots, however, it is consistent with the previous benchmark that the estimated ratio of votes to

ballot positions is ¼." United States (2015) *U.S. Election Assistance Commission.* United States

[Web Archive] Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf. [5]

---

[5]     In the latest version of the VVSG, or VVSG 2.0, the EAC adopted the position that "the value of 10,000,000 ballot positions is taken from VVSG 1.0 [VVSG2005], however it is used here as the minimum number of ballot positions to test without error. *If a larger number of ballot positions is used, there still can be no error*." (emphasis added).

140.    HAVA also requires that states who receive payments for the administration of elections must use the funds "in a manner consistent with each of the laws described in Section 21145 . . . and the proposed uses are not inconsistent with the requirements of Title III." 52 U.S.C. § 20971(c).

141.    A private cause of action, as Petitioners assert here, exists for HAVA through 42 U.S.C. § 1983. *Colon-Marreror v. Velez*, 813 F.3d 1, 22 (1st Cir. 2016) (finding a private action under 1983 for HAVA violations because the provision provided enforceable voting rights and imposes binding obligations on state officials).

142.    Section 1983 provides a mechanism for enforcing individual rights secured elsewhere as in rights independently secured by the Constitution and laws of the United States. *Gonzaga University v. Doe*, 536 U.S. 273 (2002). Importantly, a § 1983 plaintiff must assert a violation of a federal right, not just a law. *Blessing v. Freestone,* 520 U.S. 329, 340 (1997).

143.    The private cause of action pursuant to § 1983, and sought here, is found for violations of HAVA, which requires voting systems to provide the voter with the opportunity to change the ballot or correct any apparent error before the ballot is cast and counted. 52 USC 21081(a)(1)(A)(ii). Improper configuration of the voting machines by state election officials would constitute a violation.

144.    Section 1983 is currently the only mechanism where HAVA violations will receive any meaningful private review, yet it has proven thus far to be ineffectual at providing any real remedy for such violations.

145.    Congress's power to pass the HAVA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voting systems a requirement to uphold the right of the people to choose their representatives.

## D.  TEXAS ELECTION LAWS

146.    The Texas Secretary of State is the chief election officer for the State of Texas. Texas Election Code Section 31.001.

147.    The Secretary of State, Elections Division, is responsible for administering the election code.

148.    *Per* the Texas Election Code, the Secretary of State, Elections Division is required to:

a.  Identify registered voters and remove invalid registrations;

b.  Correct and revise voter registration rolls;

c.  "[I]mplement and maintain a statewide computerized voter registration list that serves as the single system for storing and managing the official list of registered voters in the state." Texas Election Code 18.061.

d.  Issue sanctions against counties/localities for non-compliance with the statewide computerized voter registration list;

e.  Implement training courses for registrars on substantial compliance with the statewide computerized voter registration list;

f.  Compare "quarterly" the voter registration list and the information received from other agencies to ensure the voter registration rolls are accurate. Texas Election Code 18.068.

g.  Take "appropriate action" to protect the voting rights of citizens. Texas Election Code Section 31.005.

h.  Refer to the Attorney General of the State of Texas that a crime in connection with an election has occurred. Texas Election Code Section 31.006.

      i.   Adopt rules as necessary to implement and maintain compliance with the Help America Vote Act and the National Voter Registration Act. Texas Election Code Section 31.007 and 31.010.

149.    Texas election laws describe numerous, criminal acts for failing to adhere to basic election guidelines, including, but not limited to:

    a.   Unlawfully acting as an agent of a voter applicant. Texas Election Code Section 13.005 and 13.006.

    b.   False Statement on an Application. Texas Election Code 13.007.

    c.   Receiving compensation for registering voters. Texas Election Code Section 13.008.

    d.   Failing to deliver a voter application. Texas Election Code Section 13.043.

    e.   Unlawful use of Computer Services. Texas Election Code Section 18.012.

    f.   Unlawful use of statewide computerized voter registration. Texas Election Code Section 18.067.

    g.   Unlawfully obstructing a watcher. Texas Election Code Section 33.061.

    h.   Unlawful preparation of ballots. Texas Election Code Section 52.0063.

    i.   Illegal voting. Texas Election Code Section 64.012.

    j.   Failure to properly preserve election records. Texas Election Code 66.058.

    k.   Relinquishing custody of a key to a ballot box. Texas Election Code 66.060.

    l.   Failure to properly sign an early voting ballot application as a witness. Texas Election Code 84.003.

    m.   Fraudulent use of application for ballot by mail. Texas Election Code 84.0041.

    n.   Compensation for assisting voters. Texas Election Code Section 86.0105.

o.   Improper approval of a voting system. Texas Election Code Section 122.031.

150.   Petitioners believe and therefore aver that the State cannot demonstrate effective control over voter eligibility in conformity with federal or state requirements, and the State has implemented a system that does not guarantee accuracy or compliance with legal mandates requiring the State to ensure that only eligible voters may register and vote.

### E.   ELECTION FRAUD CONGRESS SOUGHT TO GUARD AGAINST

151.   Petitioners do not accuse any person or entity of engaging in election fraud in 2022, nor propose any person or entity will engage in such fraud in 2024, nor in subsequent federal elections in Texas.  Petitioners' purpose in describing types of voter fraud is simply to set forth *the harms Congress sought to avoid* by implementation of HAVA and NVRA as well as the various statutes passed by the Texas General Assembly for the same purpose and cited above.

152.   Petitioners believe and therefore aver election fraud can occur in multiple diverse ways, not all of which are individualized to a specific actor.

153.   Petitioners believe and therefore aver over the past fifty years, Congress has enacted criminal laws with broad jurisdictional basis to combat false voter registrations, vote-buying, multiple-voting, and fraudulent voting in elections in which a federal candidate is on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), 20511.

154.   The federal jurisdictional predicate underlying these statutes is satisfied as long as either the name of a federal candidate is on the ballot, or the fraud involves corruption of the voter registration process in a state where one registers to vote simultaneously for federal as well as other offices. *Slone*, 411 F.3d at 647–48; *United States v. McCranie*, 169 F.3d 723, 727 (11th Cir. 1999).

155.    During voting in federal elections, individuals who do not personally participate in and assent to the voting act attributed to them, or those impersonating voters, or persons casting ballots in the names of voters who do not vote in federal elections, constitute prosecutable election fraud. *See,* 52 U.S.C. §§ 10307(c); 10307(e); 20511(2).

156.    While no accusation is made here, Petitioners aver it is *possible* for election officials acting "under color of law" to commit election fraud by performing acts such as diluting ballots with invalid ones (ballot stuffing), rendering false tabulations of votes counted, or by failing to recognize valid voter registrations or votes from being given effect in any election, federal or non-federal (18 U.S.C. §§ 241, 242), as well as in elections in which federal candidates are on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), 20511(2).[6]

157.    An individual commits election fraud by submitting fictitious names to election officers for inclusion on voter registration rolls, thereby qualifying the fictious name to vote in federal elections. 52 U.S.C. §§ 10307(c), 20511(2).

158.    An individual commits election fraud by knowingly procuring eligibility to vote for federal office by people who are not entitled to vote under applicable state law and/or people who are not Citizens of The United States. 52 U.S.C. §§ 10307(c), 20511(2); 18 U.S.C. §§ 1015(f).

159.    An individual who makes a false claim of United States' Citizenship to register to vote commits election fraud. 18 U.S.C. § 1015(f); 18 U.S.C. § 911.

---

[6]    For purposes of the present Petition, Petitioners do not suggest any Texas election officials engaged in election fraud.  Rather, Petitioners points out the *possibility* of improper conduct by election officials as a harm against which Congress and the state legislature have *sought* to guard against by enacting the various statutes cited here.  A reason Congress, especially in HAVA, set forth standards that must be met before an election is considered reliable is to counter potential election fraud and to thus produce presumptively reliable election results.

160.    A person who provides false information concerning a person's name, address, or period of residence in a voting district to establish voting eligibility commits election fraud. 52 U.S.C. §§ 10307(c), 20511(2).

161.    Fraud can occur where an individual causes the production of voter registrations that qualify alleged voters to vote for federal candidates, where that individual knows the registrations are materially defective under applicable state law. 52 U.S.C. § 20511(2)

162.    However, election fraud need not involve the participation of individual voters. Election fraud can occur where an individual or organization places fictious names on voter rolls (allowing for fraudulent ballots which can later be used to stuff the ballot box, *supra*.), casting fake ballots in the names of people who did not vote, obtaining and marking absentee ballots without the input of the voter involved, and falsifying vote tallies.

163.    When the federal government seeks to maintain the integrity of elections, it does so for specific federal interests *inter alia*: (1) the protection of the voting rights of racial, ethnic, or language minorities, a specific constitutional right; (2) the registration of voters to vote in federal elections; (3) the standardization and procurement of voting equipment purchased with federal funds; (4) the protection of the federal election process against corruption; (5) the protection of the voting process from corruption accomplished under color of law; and (6) the oversight of non-citizen and other voting by persons ineligible to vote under applicable state law. Richard C. Pilger, *Federal Prosecution of Election Offenses*, p. 30, 8th Edition (2017).

164.    Again, while not accusing anyone in Texas of engaging in misconduct hers, Petitioners believe and therefore aver Congress has enacted a litany of specific crimes that can be prosecuted under a general definition as "election fraud":

a. Conspiracy Against Rights: 18 U.S.C. § 241. *See United States v. Saylor*, 322 U.S. 385 (1944) (stuffing a ballot box with forged ballots); *United States v. Classic*, 313 U.S. 299 (1941) (preventing the official count of ballots in primary elections); *United States v. Townsley*, 843 F.2d 1070, 1073–75 (8th Cir. 1988) (destroying ballots); *United States v. Morado*, 454 F.2d 167, 171 (5th Cir. 1972) (casting absentee ballots in elderly or handicapped peoples' names); *Crolich v. United States*, 196 F.2d 879, 879 (5th Cir. 1952) (impersonating qualified voters); *United States v. Colvin*, 353 F.3d 569, 576 (7th Cir. 2003) (conspiracy need not be successful nor need there be an overt act).

b. Deprivation of Rights under Color of Law: 18 U.S.C. § 242. *See United States v. Price*, 383 U.S. 787 (1966) (acted jointly with state agents); *Williams v. United States*, 341 U.S. 97 (1951) (actions clothed under Color of State Law).

c. False Information in, and Payments for, Registering and Voting: 52 U.S.C. § 10307(c).[7]

d. Voting More than Once: 52 U.S.C. § 10307(e).

e. Fraudulent Registration or Voting: 52 U.S.C. § 20511(2).

f. False claims to Register or Vote: 18 U.S.C. § 1015(f).

g. "Cost-of-Election" theory: 18 U.S.C. § 1341.

h. Improper Retention of Federal Election Returns: 52 U.S.C. § 20701.

165. In short, Petitioners maintain election fraud can constitute numerous different actions or inactions, and federal and state governments of the United States have an interest in

---

[7] "Section 10307(c) protects two distinct aspects of a federal election: the actual results of the election, and the integrity of the process of electing federal officials." *United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 1994).

guarding the integrity of elections, and ensuring election fraud is stopped, then prosecuted appropriately.

## VII.    FACTS AND SUMMARY OF ISSUES

166.    Petitioners United Sovereign Americans reviewed Texas's voter registration data from the 2022 general election including the data which contained millions of entries of voter registration information (purportedly) for Texas's voters.

167.    Thereafter, Petitioner believes and therefore avers that expert data analysts acting on behalf of Petitioner United Sovereign Americans, and available at time of trial, performed a series of SQL database queries on the data to extrapolate and refine information about voter registrations in the State.

168.    Thereafter, Petitioner United Sovereign Americans and undersigned counsel thoroughly reviewed those results and resulting expert opinions.

169.    Petitioners will present in advance of trial such results and expert opinions reduced to writing and present such expert testimony at trial subject to cross examination.

170.    Petitioner United Sovereign Americans' expert review of SQL database queries revealed *hundreds of thousands* of apparent voter registration errors in the State of Texas. *Infra.*

171.    The results from the SQL database queries allowed Petitioners' experts to produce a "Scorecard" reflecting Texas' voter registration data detailing these hundreds of thousands of apparent errors contained within that registration data. *See* Exhibit "A" for a copy of Petitioner United Sovereign Americans' expert's Texas 2022 General Election Validity Scorecard.

172.    In addition, the results from the SQL Database Queries of Texas'voter registration data allowed Petitioners' experts to compile a General Election Validity Reconciliation. *See*

Exhibit "E" for a copy of United Sovereign American's Texas 2022 General Election Validity Reconciliation.

173.    According to the data provided to Petitioner United Sovereign Americans for the 2022 election, Texas had 19,109,291 voter registrations.

## A.  VOTER REGISTRATION ROLL INACCURACY

174.    Expert analysis by Petitioner United Sovereign Americans of the official Texas State Voter Registration Data for the 2022 election revealed that, out of 19,109,291 voter registrations in Texas at that time, there were a total of **1,352,202** voter registration violations including:

37,167 votes were cast by voters with illegal duplicate registrations;

29,847 votes were cast by voters from invalid addresses;

620 votes were cast with age discrepancies;

178 votes were cast with names embedded with numerals and symbols;

122 votes were cast which had transposed names on the same address;

142 votes from unique voter registrations that cast multiple votes according to the state voter rolls;

1715 votes from unique voter registrations, which cast multiple votes according to the county voter rolls;

7 votes from a voter listed in a county voter roll with a state voter ID of zero;

13,229 voters listed in the state voter roll with an unidentified voting method;

113,386 voters recorded in a county voter roll, but missing from the state voter roll, or vice-versa; and

244 votes where the voting method differs in the county voter rolls and the state voter rolls.

*See* Exhibit "A" for a copy of United Sovereign American's Texas 2022 General Election Validity Scorecard. *See* Exhibits "F" and "G" for supplemental data and detailed findings.

175.    This data shows that in 2022 the voter rolls in Texas were not accurate and current as required by NVRA, HAVA, nor in conformity with specific Texas laws pertaining to voter registration. 52 U.S.C.A. § 20501(b)(4); 52 U.S.C.A. § 21081; and N.C.G.S. 163-22.

176.    Thus far, Petitioners have exhausted every remedy known to them to have Texas correct these issues in advance of the 2024 general election. Petitioners continued in 2024 to seek redress and repair for these egregious violations through normal democratic means without success, placing Texas' Respondents on notice of the various potential violation of federal and state law.

177.    Respondents then dismissed, and continue to dismiss, Petitioners' concerns and, based on information and belief, did so without any meaningful review, action, or response.

178.    Petitioners believe and therefore aver Respondents intend to administer and ultimately certify Texas's 2024 general election and subsequent federal elections (involving both state and federal contests) using the same inaccurate and flawed data and conditions in violation of federal and state statutes.

**B.  VOTES FROM INELIGIBLE VOTERS**

179.    Expert analysis on behalf of Petitioners of the official Texas State Voter Registration Data for the 2022 election revealed that, out of the votes cast in the 2022 general election, there were a total of **196,658** evident voting violations. These violations were in the form of:

37,167 votes were cast by voters with illegal duplicate registrations;

29,847 votes were cast by voters from invalid addresses;

620 votes were cast with age discrepancies;

178 votes were cast with names embedded with numerals and symbols;

122 votes were cast which had transposed names on the same address;

142 votes from unique voter registrations that cast multiple votes according to the state voter rolls;

1715 votes from unique voter registrations, which cast multiple votes according to the county voter rolls;

7 votes from a voter listed in a county voter roll with a state voter ID of zero;

13,229 voters listed in the state voter roll with an unidentified voting method;

113,386 voters recorded in a county voter roll, but missing from the state voter roll, or vice-versa; and

244 votes where the voting method differs in the county voter rolls and the state voter rolls.

*See* Exhibit "A" for a copy of Petitioners United Sovereign American's Texas 2022 General Election Validity Scorecard. *See* Exhibits "F" and "G" for supplemental data and detailed findings.

180.    Petitioners believe and therefore aver this data shows that in 2022, the voter rolls in Texas were not accurate and current as required by the NVRA, HAVA, and specific Texas laws pertaining to voter registration. 52 U.S.C.A. § 20501(b)(4); and 52 US.C.A. § 21081.

181.    Thus far, Petitioners have exhausted every remedy known to them in advance of the 2024 general election to have these issues, and all issues raised above and below, addressed,

and remedied. Petitioners continued in 2024 to seek redress and repair for these egregious violations through democratic means without success placing Texas' Respondents on notice of the various potential violation of federal and state law.

182.    Respondents ignored or dismissed, and continue to ignore or dismiss, these concerns without apparent meaningful review, action, or response, and furthermore Petitioners believe and therefore aver Respondents intend to administer and certify Texas's 2024 (and subsequent) general election(s) (involving both state and federal contests) under the same inaccurate and flawed conditions as that have utilized in 2022 in conducting Texas's combined federal and state elections.

## C.  ERROR RATES IN 2022 COMPARED TO RATES PERMITTED BY FEDERAL LAW

183.    Texas's voting systems are subject to the permissible error rates set forth by Congress in HAVA and further elucidated by the FEC Voting System Standards 3.2.1 and explained in the EAC's VVSG. *Supra*.

184.    The *maximum* number of apparent voting system errors permissible in counting votes in the 2022 Texas General Election using the calculations set forth by the Federal Election Commission upon mandate by Congress was sixty-five (65) errors at most allowed. The total number of *unique ballots* impacted by voting system errors in the Texas General Election, however, was 196,658 apparent errors, far exceeding the 65 maximum number. *See* Exhibit "A." *See* Exhibits "F" and "G" for supplemental data and detailed findings.

185.    Even accounting for the possibility that, of the 196,658 apparent errors, many were not *true* errors, Petitioners believe and therefore aver, the State cannot demonstrate that the

2022 General Election had sixty-five (65) or fewer errors such that the election could be considered reliable for certification.

186.    Under HAVA, an error rate of no more than one in 125,000 is permissible before the results of the *entire election* becomes suspect, and the integrity and reliability of the election compromised.   As mentioned above, this figure is calculated by dividing the total number of Texas votes in a given election by 125,000, to arrive at the number of permissible errors in any given election in order to create the error rate of no more than one in 125,000 mandated by the VVSG and HAVA.

187.    Petitioners believe and therefore aver for the 2022 General Election this is 8,102,908 (votes cast) divided by 125,000 leaves sixty-five (65) (rounded up) as the maximum errors permitted, meaning that in order for *the election to be considered valid, there cannot have been more than 65 voting system apparent errors in the entire ballot tabulation* for all ballots cast in that election in Texas.

188.    However, in the 2022 Texas General Election, the number of voting system apparent errors in counting ballots for the 2022 general election was 196,658, a figure dramatically exceeding the maximum allowable apparent error rate of sixty-five (65).

189.    Because the voting system apparent error rate for the 2022 Texas General Election was far above the maximum allowable error rates, Petitioners believe and therefore aver the reliability and credibility of the 2022 results are cast into doubt as a matter of law.

**D.  VOTER-TO-VOTE DEFICIT**

190.    The official canvas for the 2022 Texas Election was 8,102,908 ballots cast, yet the data shows there exist either 8,120,067 total ballots cast (state voter roll count) or 8,084,602 total ballots cast (county voter roll count) – respectively a discrepancy of 18,306 more votes, or

17,159 fewer votes, than the State's certified results.[8]  *See* Exhibit "A." *See* Exhibits "F" and "G" for supplemental data and detailed findings.

191.    This discrepancy may be defined as a Voter-to-Vote deficit.

192.    Petitioners believe and therefore aver that Texas election officials cannot explain or account for the discrepancy of either 18,306 *more* votes or 17,159 *fewer* votes than Tesas' official results for  ballots cast in total for 2022.  Obviously, either number far is in excess of the allowed sixty-five (65), and indisputably each constitutes an "error," rendering the 2022 Texas General Election results *unreliable*, and on that issue *alone*, should have prevented the certification of the results of such federal elections by Texas State Election Officials.

193.    Petitioners believe and therefore aver that the **17,159 less votes counted than voters who voted, or 18,306 more votes counted than voters who voted** means that either tabulators overcounted votes statewide, under counted county by county, or there exists an alternative source of the data discrepancy.[9]

**E.  TEXAS'S 2022 GENERAL ELECTION VALIDITY**

194.    For Texas's 2022 General Election, out of the 19,109,291 total registrations, of which Petitioners believe and therefore aver, there were 16,417,118 *valid* registrations, 1,234,740

---

[8]        Upon proof, Petitioners ask the Court to consider as probative of the magnitude of the errors in 2002, by itself, that the state and combined county results differ by a span of 35,465 ballots cast (adding 18,306 + 17,159) since former showed *more* ballots counted than ballots cast, and the latter showed *fewer* ballots counted than ballots cast relative to the official total of ballots cast.  Petitioners point out it is beyond dispute that the county combined total, and the state total ought to be the same, and a discrepancy of 35,464 between the two is intolerable under HAVA.

[9]        Once again, Petitioners accuse no one of engaging in fraud or deceit.  Petitioners merely point out the discrepancy, which could be due to unintentional tabulator error, fraud of unknown origin, a combination of both, or even fraud by the tabulators themselves. **It is a fact** that the discrepancy occurred in 2022 for an undetermined (and uninvestigated) reason.  It is the discrepancy *itself*, regardless of the cause, which demonstrates an error rate in excess of that permitted by HAVA calling into question the very integrity of the election.  Petitioners proposes to ask this Court to order law enforcement Respondents to ascertain why the discrepancy occurred in 2022, ensure that a similar discrepancy of such massive quantity does not re-occur in 2024, and in all federal elections thereafter in the future.

uncertain/illogical/invalid registrations, 68,874 registrations which violated election laws, and 1,388,559 "Deadwood" registrations.[10] *See* Exhibit "E." *See* Exhibits "F" and "G" for supplemental data and detailed findings.

195.    Petitioners believe and therefore aver their analysis shows that of the people holding the 16,417,188 valid registrations, state officials counted 7,949,992 votes in the 2022 General Election.

196.    Petitioners believe and therefore aver that of the identified 1,234,740 uncertain/illogical/invalid registrations, **155,630 people voted** and whose votes *counted* in the 2022 General Election, each of which Texas election officials should have confirmed eligibility to vote before counting that vote and Petitioners aver did not, thus diluting the value of the votes of Texans who properly registered.

197.    Petitioners believe and therefore aver that of the total of 1,303,614 registrations that may have violated election laws in one way or another, **170,075** people holding such registrations *cast votes that were counted* in the 2022 General Election, each of which Texas election officials should have confirmed eligibility to vote before counting that vote and Petitioners aver did not, again diluting the value of the votes of Texans who properly registered.

198.    Petitioners believe and therefore aver that while *none* of the 1,388,559 "Deadwood" registrations, or fake name registrations, Texas listed as having voted in the 2022 General Election, those registrations still exist for unscrupulous persons to utilize fraudulently to cast votes in future elections.

199.    Petitioners believe and therefore aver that the *registration* error rate in Texas for the 2022 General Election was **approximately seven percent (6.8%)** of the total registrations on

---

[10]      "Deadwood" is a concept dealing with election fraud and is defined as a fake voter registration record. These registrations could include a voter who is deceased, ineligible, moved, etc.

the State's voter rolls.  This figure is arrived at by taking 1,234,740 uncertain/illogical/invalid

registrations, plus 68,874 registrations which violated election laws, as a percentage of

19,109,291 total registrations.

200.    Petitioners believe and therefore aver that the *voter* system error rate in Texas for

the 2022 General Election was **two percent (2.1%)**, arrived at by taking 155,630 votes counted

from uncertain/illogical/invalid registrations, plus 14,445 votes counted from illegal

registrations, as a percentage of 7,949,992 votes cast.

201.    *Per* HAVA and the FEC, the legal standard of allowable registration errors for a

federal election is 0.0008% (or 1 out of 125,000) yet the voter system error rate in Texas's 2022

combined state and Federal General Election was 2.1%.

## VIII.   REQUESTED RELIEF
## ALL WRITS ACT RELIEF – 28 U.S.C. § 1651

202.    Petitioners incorporate the previous paragraphs by reference as if set forth at

length here.

203.    Petitioners are not seeking to undermine official elections results previously

certified.  Petitioners has cited issues in prior Texas federal elections to add weight to Petitioners'

belief that absent intervention by this Honorable Court, Respondents will permit the same

apparent errors to occur in the 2024 (and subsequent) federal general elections in Texas.

204.    Petitioners seek redress from the constitutional harm brought upon them and will

be brought upon them, Petitioner Johnson running for Congress in 2024, and the Texas electorate

at large, by Respondents' failure to comply with federal and state election law.

205.    Petitioners believe and therefore aver that Respondents have done nothing, or an

inadequate job, addressing the issues presented in this Petition – particularly to address the

inaccurate and likely fraudulent voter rolls and voter systems used in federal elections conducted by state authorities.

206.    Respondents' inaction and/or failure to act compels Petitioners to ask the Court to issue a Writ of *Mandamus* requiring Respondents to comply with and enforce the two federal statutes at issue (the NVRA and the HAVA) along with the Texas Election Code, 25 PA. C.S. § 1222(c), while giving Respondents a reasonable time within which to bring Texas into compliance in time for the 2024 General Election and all federal elections conducted by the State going forward, while providing relief to 2024 voters if, upon showing by Respondents, bringing the State into fully into compliance in time is impossible.

207.    Specifically, Petitioners respectfully seek the Court order Respondents take steps, both short term and long term, to ensure the apparent errors made during the 2022 elections do not recur, and to bring the State into compliance with HAVA's specific mandate of no greater than 1 voting error out of 125,000 votes in the 2024 and subsequent federal general elections in Texas.

208.    This Honorable Court is authorized to issue a writ of *mandamus* under "The All-Writs Act," 28 U.S.C. § 1651 granting the power to United States Federal Courts to "issue all writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law."

209.    A writ of *mandamus* under 28 USC § 1651 is typically used to fill gaps in the law, and the Supreme Court has stated that The All-Writs Act is a "legislatively approved source of procedural instruments designed to achieve 'the rational ends of the law.'" *Harris v. Nelson*, 394 U.S. 286 (1969) (All Writs Act *mandamus* properly used to conduct factual inquiries).

210.    A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (*quoting Cheney v. United States Dist. Ct.*, 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law)).

211.    A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens (including candidates) when a governmental agency or official has refused to perform a ministerial duty that the Petitioners have established, they have a clear legal right to have the governmental agency or officials, in this case Respondents, perform.

212.    A federal court may use all auxiliary writs as aids when it is "calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it." *Adams v. United States*, 317 U.S. 269, 273 (1942) (writ of *habeas corpus* is available to the circuit courts of appeals).

213.    A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

214.    "Mandamus is employed to compel the performance, when refused, of a ministerial duty . . . [i]t also is employed to compel action, when refused, in matters involving judgment and discretion, but not to direct the exercise of judgment or discretion in a particular way nor to direct the retraction or reversal of action already taken in the exercise of either." *Wilbur v. United States*, 281 U.S. 206, 218 (1930). *See also Decatur v. Paulding*, 39 U.S. 497, 514-17 (1840) (Secretary of the Navy's duty to approve of pensions was discretionary, and therefore, not ministerial); *Kendall v. United States*, 37 U.S. 524 (1838) (Postmaster General had a ministerial duty to make entries); *Work v. Rives*, 267 U.S. 175, 177 (1925).

215.    Instantly, Petitioners have no other remedy apart from a writ of *mandamus*.

216.    Petitioners argue that injunctive and/or declaratory relief is inapplicable or appropriate in this matter because the harm from the 2024 election is not yet realized and Petitioners are seeking to have Texas election officials and/or federal officials bring the State into compliance with federal and state law, specifically HAVA, NVRA, and the Texas Election Code, 25 PA. C.S. § 1222(c), absent a specific existing private cause of action, apart from those Petitioners assert herein under NVRA and HAVA above, Petitioners could assert that affords Petitioners the relief sought necessitating Petitioners' request in equity,

217.    Petitioners believe and therefore aver and assert private causes of action in equity to enforce federal and state law where Respondents have allowed, and continue to allow, violations of federal election laws, State election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which laws include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems. 52 US.C.A. § 20501; 52 US.C.A. § 21083.

218.    Petitioners believe and therefore aver that the voter rolls within the State of Texas are inaccurate, in violation of NVRA and HAVA, and not simple list maintenance failures. The inaccuracies represent Texas' failure to control the process of validating and registering only qualified citizen voters. Petitioners' data upon expert review demonstrates persons possessing apparently invalid and/or illegal registrations voted in large numbers in Texas's 2022 General Election.

219.    Petitioners believe and therefore aver State Respondents have lost control of voter registration, leading to the distribution of ballots to what appear to be false registrants which, in turn has resulted diluting the value of the votes of all voters including Petitioners' votes,

hamstringing Petitioner Johnson's campaign for Congress, and harming the electorate at large. The voter-to-vote deficit alone is illustrative in that the official canvas for the 2022 Texas Election had more votes than recorded, or fewer votes than recorded, as detailed above.

220.    Petitioners believe and therefore aver in upholding HAVA the Court should order as part of Petitioners' relief that Respondents perform risk assessments and proper certification of all system elements individually, and on the system as a whole to comply with the Act.

221.    Petitioners believe and therefore aver Texas election officials' job is fidelity to the law in administering the electoral process, thereby protecting the integrity of an election, and Texans from corruption in the election process.

222.    Petitioners believe and therefore aver that State officials' failure to follow the law has resulted in election outcomes in 2022 and previously that are untrustworthy. The voting system in its present form cannot be used to produce trustworthy and reliable results without judicial intervention as Petitioners contend.

223.    Petitioners believe and therefore aver that a writ of *mandamus* is appropriate in this case. Respondents have failed, and continue to fail, in complying with federal and state laws regarding voting – including voting accuracy and accountability. It is clear from the Respondents conduct before, during, and after, the 2022 elections that, absent judicial action, despite amble notice, Respondents will do nothing to repair the deficiencies noted above to ensure Texas elections are conducted in compliance with federal and state law and ensure their reliability and integrity.

224.    The scope of Petitioners' *mandamus* request is narrow: Petitioners seek this Court order Respondents to follow existing federal and state law designed by Congress and the Texas

legislature to ensure that Texas' 2024 and subsequent combined federal and state general elections produce reliable results within the margin of error rate allowed.

225.    Petitioners hold up the mathematically unreliable analysis (according to, *inter alia*, HAVA) of the 2022 Texas combined federal and state General Election as evidence that, should the writ not issue, the apparent error rate in the 2024 and subsequent combined general elections will continue to exceed the law's mandated permissible maximum error rate, and continue to produce election results that are unreliable that should not be certified.

## A.  ACTION TO COMPEL A QUASI OR AGENCY OFFICER OF THE UNITED STATES TO PERFORM HIS DUTY

226.    Petitioners seek that the requested writ direct Respondents to investigate and remedy the issues exposed in the 2022 elections to avoid repeating the same mistakes in future combined federal and state general elections which are constitutionally administered by Texas pursuant to Article I, Section 4 (delegating to the state legislatures the power to regulate federal elections for members of the House of Representatives, with reserving to Congress the power to "…alter such Regulations [made by the various state legislatures]…"),[11] and, generally, Article II, Section 1 (granting state legislatures the power to determine how presidential electors are chosen) of the United States Constitution.[12]

---

[11]    Petitioners aver that NVRA and HAVA are examples of Congress' exercising its power under Article I, Section 4 to "alter" Texas' (and all other states') otherwise absolute constitutional authority to regulate federal elections to the House of Representatives and, by application of the 17th Amendment to the U.S. Constitution providing for the direct election of two senators from each state, Congress may exercise its authority "…from time to time by Law make or alter such Regulations…" [of the various states…] to regulate the election of United States Senators as well the election of members of the House of Representatives.

[12]    Petitioners includes citation to Article II and the choosing of electors for president and vice-president, (later modified by the 12th Amendment), to again demonstrate the Framers' intent that the various states shall have *presumptive* authority to regulate and administer the election of all federal officers on the ballot for consideration in a federal election.  Article 1, Section 4 (as later amended) and Article II, Section 1 (as later amended) are examples of where the Framers intentionally intertwined the powers of the various states with those of Congress, while making certain Congress maintained the *ultimate* power to regulate the election of its members, the then-prevailing concepts of *Federalism* and *Dual Sovereignty* notwithstanding.

227.    Petitioners believe and therefore aver that since the Constitution reserves to Congress the *ultimate* (as opposed to the *presumptive*) power to regulate the means by which Congress' own members are chosen, while the Constitution simultaneously delegates the presumptive power to regulate such elections to, in this case, the legislature of the State of Texas to further delegate as it sees fit to do so by law, the Respondents here who are not federal officers *per se*, *become* federal officers by agency, requiring them to carry out not only Texas election law, but additionally carry out federal election statutes passed by Congress and duly signed into law by the President under Congress' ultimate authority laid out in Article I, Section 4 of the Constitution.

228.    Petitioners believe and therefore aver that delegations of authority by the General Assembly of powers to supervise federal elections to any Respondent State officials pursuant to the state legislature's power to regulate federal elections granted by Article I, Section 4, makes said State Respondents into federal officers by agency or quasi-federal officials in the conducting of their duties to regulate federal elections.

229.    Petitioners believe and therefore aver that ordinary principles of federalism and dual sovereignty where a federal district court judge would be reluctant to issue an order to a State official pertaining to how that state official may perform his/her official functions are inapplicable because Respondent State officials are acting in a hybrid role as a quasi-federal officer as required by Article I, Section 4.

230.    Petitioners believe and therefore aver, then, that this Honorable Court has authority to issue the requested writ of *mandamus* to compel, not just the Respondent Federal officers to ensure that federal election law is conducted in Texas's 2024 and subsequent general elections. This Court also has the authority to compel Respondent State officials to perform

duties under the U.S. Constitution because said officials are charged by the Constitution in the conducting of federal law where Congress has asserted its power to "alter" existing Texas federal election procedures as it did in enacting NVRA and HAVA.

231.    Petitioners believe and therefore aver that any delegation of power over elections from the Texas legislature to the Executive Branch of Texas government (e.g., to the Governor who in turn delegates power to the Secretary of State, or any delegation of the General Assembly's power to regulate federal elections to the Attorney General) still falls under this Court's authority which is derived through Article I, Section 4's grant to the various state legislatures the power to supervise federal elections.

232.    Petitioners believe and therefore aver that simply because the state legislature may have chosen to delegate some of its authority to supervise federal elections to Respondent members of the State's Executive Branch of government, such delegation does not insulate such officials and offices from the power of this Court, since this Court's power comes from its authority over the delegating entity, in this case the Texas legislature.

### B.  ACTION TO COMPEL AN OFFICER OF THE UNITED STATES TO PERFORM HIS DUTY – 28 U.S.C. § 1361

233.    Petitioners incorporate the previous paragraphs as if set forth at length here.

234.    District Courts are empowered with the ability to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff. 28 U.S.C. § 1361.

235.    Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice are parties responsible for the enforcement of federal election laws, specifically HAVA and NVRA.

236. Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice are officers, employees, or an agency of the United States.

237. Petitioners believe and therefore aver that Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice, have done nothing, or, at best, an inadequate job at addressing the issues presented above – namely, the inaccurate and likely fraudulent voter rolls and systems within Texas.

238. The inaction and/or failure to act is harming Petitioners and the Texas, a current candidate for Congress, and the electorate at large, warranting that the Court issue a Writ of *Mandamus* compelling Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice to enforce and police the two federal statutes at issue (NVRA and HAVA) for implementation in the Texas 2024 General Election and subsequent federal and state elections administered by State officials and giving Respondents a reasonable period of time in which to do so.

239. Specifically, the Court should order Respondents to take preventative measures to see the apparent errors evident the 2022 elections are not repeated in the 2024 and subsequent elections and bring the State into compliance with HAVA's specific mandate of no greater than one voting error out of 125,000 votes to ensure reliable election results as HAVA intended.

240. A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (quoting *Cheney v. United States* Dist. Ct., 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law).

241.    A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that the Petitioners has established has a clear legal right to have the governmental agency or official, in this case Respondents, perform.

242.    A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

243.    Relief contemplated under statute providing that federal district courts shall have original jurisdiction of any action in nature of mandamus to compel an officer or employee of United States or any agency thereof to perform a duty owed to plaintiff is at least as broad as under common-law writ of *mandamus*. *Carey v. Local Bd. No. 2, Hartford, Conn.*, 297 F.Supp. 252 (D. Conn. 1969), aff'd, 412 F.2d 71 (2d Cir. 1969).

244.    Petitioners believe and therefore aver they have no other remedy than a writ of *mandamus* to compel an officer or employee of the United States or any agency thereof to perform a duty owed to plaintiff/Petitioners.

245.    Petitioners argue that injunctive and/or declaratory relief is inapplicable or inappropriate to its issues because the harm from the 2024 election is not yet realized and Petitioners is seeking to have Texas election officials and/or federal officials bring the State into compliance with federal and state law using private causes of action, specifically under HAVA, NVRA, and the Election Code, absent other specific private causes of action that afford Petitioners relief.

246.    Petitioners believe and therefore aver Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of

Justice have allowed, and will continue to allow, violations of federal election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems.

247.    Petitioners believe and therefore aver the voter rolls within the State of Texas are inaccurate, in violation of NVRA and HAVA. That these are not list maintenance failures. Instead, the inaccuracies represent a failure to control the process of validating and registering only qualified citizen voters. Persons voted in the Texas 2022 General Election in significant numbers who held apparently invalid and/or illegal registrations that Texas election officials, on information and belief, did nothing to verify the legitimacy of those registrants' casting ballots.

248.    Petitioners believe and therefore aver that Respondents' failure to follow the law, or enforce the law, has resulted in election outcomes that are untrustworthy and unreliable. The State's voting system in its present form cannot be trusted to produce reliable results under HAVA, because Respondents will not follow the dictates of the Act necessitating this judicial intervention.

249.    A writ of *mandamus* against Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice is appropriate in this case. Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice have failed, and continue to fail, in requiring the State of Texas to comply with federal laws regarding voting – including voting accuracy and accountability as is clear from expert analysis into Texas' conduct of the 2022 Texas General Election.

250.    Petitioners believe and therefore aver that without judicial action Respondents will do nothing to comply with HAVA and other federal and state statutes to ensure the integrity of Texas's elections and the same issues that are evident from the 2022 General Election will call into question the validity of Texas's 2024 and subsequent General Election results.

251.    The scope of this request for a writ of *mandamus* is narrow: Petitioners seek a judicial order requiring Respondents, both federal and state, follow the laws cited herein in conducting the 2024 and subsequent federal elections, and adequately investigate and remedy the problems exposed in and 2022 elections as detailed above.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**,  Petitioners respectfully request Your Honorable Court formally recognize Texas' voter registration rolls contained hundreds of thousands of apparent errors in the 2022 General Election. Further, that these apparent errors took the form of illegal duplicate registrations, incomplete or unknown addresses, registrations on or before the registrant's date of birth, age discrepant registrants, registrations on a federal holiday, registrations on Sunday, registrations with modified dates of birth, registrants whose voter history inexplicably changed, registrants with registration dates altered backwards, and registrants with altered "unique" state voter identification numbers. Petitioner asks this Court to enter an order in *mandamus* compelling Respondents to ministerially correct the apparent errors evident from the 2022 elections data, ascertain to the Court's satisfaction the reasons why the 2022 errors occurred, and prevent those same or similar ministerial errors from recurring during the Texas 2024 General Election and all subsequent federal general elections to ensure the integrity of Texas' combined federal and state elections going forward for years to come.  Petitioners, additionally, seek pursuant to permissible causes of action under NVRA and HAVA, this Court order that the State

of Texas' may not certify the 2024 General Election unless and until the relevant Respondents have demonstrated to the Court that the 2024 General Election and subsequent elections were conducted in conformity with federal and state law and with fewer than the maximum errors permissible. **Petitioners further request this Honorable Court order the state, and any subdivision thereof responsible for voter registrations, submit voter registration requests (and any existing registrations reasonably in question) to the Department of Homeland Security to verify the citizenship or immigration status of persons seeking registration to vote or who are presently on the state's voter rolls whenever there exist any reliable indicators that an applicant or registered voter may not be a U.S. citizen. (*see*: 8 U.S.C. secs. 1644 & 1373(c)).** Lastly, Petitioners seek and order in *mandamus* requiring all public officials named as Respondents perform their duties as the law intended whether it be conducting federal elections in conformity with the law or investigating, and where warranted in their discretion, prosecuting persons, or entities for failing to perform their duties in conformity to the law after being given timely notice to do so.

Respectfully Submitted,

Date:   August 27, 2024

By:  */s/ Bruce L. Castor, Jr.*
Bruce L. Castor, Jr. (PA Id. No. 46370)
Admitted to Practice Unites States District
 Court, Northern District of Texas
*Attorney for Petitioners*

1219 Spruce Street
Philadelphia, PA 19107
Main: (215) 546-1000
Fax: (215) 546-8529
Email: bcastor@mtvlaw.com